## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **KADY-ANN COX,**<br>                    **Plaintiff,** | **CIVIL ACTION** |
|                    **v.** | |
| **SEPTA and POLICE CHIEF THOMAS NESTEL,**<br>                    **Defendants.** | **NO.  21-CV-04542** |

### MEMORANDUM

**HODGE, J.**                                                    **December 26, 2024**

Plaintiff Kady Ann Cox, a former Southeastern Pennsylvania Transportation Authority ("SEPTA") transit officer, brings this employment discrimination case against Defendants SEPTA and former SEPTA Police Chief Thomas Nestel, in his official capacity, following her termination from SEPTA. She alleges that SEPTA violated Title VII of the Civil Rights Act, the Pennsylvania Human Rights Act ("PHRA"), and § 1983, and brings claims against former Chief Nestel for PHRA and §1983 violations. Defendants move for summary judgment on all claims. For the reasons that follow, Defendants' Motion for Summary Judgment is granted.

## I.    BACKGROUND[1]

Plaintiff Kady Ann Cox is an African American woman who began working for SEPTA as a Transit Officer in March 2017. (ECF No. 1 ¶ 7; ECF No. 32-4 at 34:7-11.) During her employment, Plaintiff was a member of the Fraternal Order of Transit Police ("FOTP"), the union that represents SEPTA transit police officers. (ECF No. 32-4 at 23:10-13.) In or about December 2018, Plaintiff was assigned to work out of the Frankford Transportation Center ("FTC"), District 4. (ECF No 36-7 ¶ 3.)

---

[1]        The Court adopts the pagination supplied by the CM/ECF docketing system.

**A.  Incident at Frankford Transportation Center**

On September 28, 2019, Plaintiff was on duty at FTC and responded to a radio call stating that a suspect, Ms. Howard, was causing a disturbance at a store within the FTC. (ECF No. 1 ¶ 14; ECF No. 32-4 at 81:9-16.) By the time Plaintiff responded to the scene, Howard had left the store. (ECF No. 32-4 at 82:1-5.) However, Plaintiff, who had encountered Ms. Howard in the past, continued to patrol the area looking for Howard. (*Id.* at 82:8-12.) When Plaintiff spotted Howard, Plaintiff told Howard that she was not allowed to be there and grabbed her shoulder to escort her away. (*Id.* at 82:13-23.) Ms. Howard then hit Plaintiff in the face. (*Id.*) Plaintiff and Howard then engaged in a physical confrontation, wherein Plaintiff hit Ms. Howard and the two "began fighting." (*Id.* at 87:22-88:2.) During the altercation between Plaintiff and Howard, another transit officer, Officer Sannini, arrived on the scene and pulled Ms. Howard off of Plaintiff. (*Id.* at 88:4-14.) At least three additional officers also responded to the scene and surrounded Ms. Howard. (*Id.* at 90:14-91:8.) At that point, there was some distance and at least three officers between Plaintiff and Ms. Howard. (*Id.* at 91:19-24.)

Defendants have produced video from the Body Worn Cameras ("BWC") of several officers who were at the FTC during the incident. (*See generally* ECF Nos. 32-6; 32-8; 32-9.) The BWC video shows Howard, her lip covered in blood, repeatedly crying, "she hit me," while a responding officer holds Howard's arms back and down. (ECF No. 32-6 at 00:11-00:35.) The officer then leads Howard to a bus stop bench, where she starts to sit down. (ECF No. 32-6 at 00:33.) Plaintiff can be seen following behind the officer and Howard, smiling. (ECF No. 32-7 at 00:08.) Plaintiff then approaches Howard and says, "I hit you?" and swings her hands towards Howard. (ECF No. 32-15 at 7; 32-4 at 16-18.) Plaintiff then says, "Now I fucking hit you." (ECF

No. 32-4 at 16-18.) A bystander can be heard exclaiming "You did not have to hit her just now! You was wrong! Why the fuck you hit her like that just now?" (ECF No. 32-7 at 00:22.)

Multiple officers then again restrain Howard. (ECF No. 32-6 at 00:50; ECF No. 32-8 at 00:01.) As Plaintiff continues to engage Howard, Officer Brady counsels Plaintiff that the situation is not worth losing her job over. (ECF No. 32-4 at 24.) A fellow transit officer says, "Relax! Kady relax, please, stop, you're making it worse. Calm down." (ECF No. 32-8 at 1:15.) Plaintiff approaches Howard, and Howard leans over and spits toward Plaintiff. (ECF No. 32-8 at 01:26.) Plaintiff then yells, "You spit on me!" and pushes toward Howard, while another officer grabs Plaintiff's vest and pushes her backward. (ECF No. 32-8 at 01:32.) Plaintiff says, "Don't fucking play with me." (ECF No. 32-8 at 1:35.) An officer says to Plaintiff, "Kady you can't do this, it doesn't matter, you're going to lose your job." (ECF No. 32-8 at 01:44.) Plaintiff can be seen holding her baton and jamming it against a wall. (ECF No. 32-8 at 1:44.) Plaintiff then puts her baton away, paces for a moment, then smiles and points at Howard. (ECF No. 32-8 at 02:10.) The other officer then says, "Put that away. Do you know how bad it looks? Kady, don't do nothing in front of [unintelligible] people. (ECF No. 32-8 at 02:53.) Shortly after, another officer asks Plaintiff to go get a patrol car and "cool off." (ECF No. 32-8 at 04:15.)

### B. Internal Affairs Investigation

Following the incident at the FTC involving Plaintiff and Ms. Howard, SEPTA's Internal Affairs department conducted an investigation. (ECF No. 32-15 at 2.) While the investigation was ongoing, Plaintiff was pulled off her patrol assignments and reassigned to the Legal Department to perform "virtual patrol." (ECF 36-7 at ¶ 7.) As part of the investigation, Internal Affairs interviewed Plaintiff three times— October 25, 2019, November 1, 2019, and November 19, 2019. (ECF No. 32-15 at 5.) A memorandum summarizing the Internal Affairs investigation was

prepared by Sergeant Devon M. Isaac and provided to SEPTA Police Chief Nestel on November 21, 2019. (*See generally* ECF No. 32-15.) The memo indicates that Internal Affairs found that "Cox unequivocally punched a person in the face, despite the fact that the person was no longer engaged with Cox and was no longer a threat." (*Id.* at 12). The memo also stated, "there is evidence to suggest that Cox may have lied during the Internal Affairs investigation." (*Id.*) In the first two interviews with Internal Affairs, Plaintiff "maintained that she swung at the woman, but she was not sure if the punch landed," although the BWC footage clearly shows her punching Ms. Howard and taunting her about doing so. (*Id.*) The memo indicated that "Cox lied a second time when she was shown the [BWC] footage of her arm punching Howard, but Cox denied that it was her arm." (*Id.*) Finally, during the third interview, Plaintiff "admitted that she punched Howard, but she continued to lie about whether or not her arm was pictured in the video punching Howard." (*Id.*)

The investigator concluded that Plaintiff violated the following SEPTA Police Department Policies:

1. **404.4.1** USE OF FORCE IN GENERAL: The response to resistance should be in direct relationship to the amount of resistance encountered or the threat to the officer or another. The response to resistance will be progressive in nature and may be in the form of verbal, physical, non-lethal or lethal force. No officer will use ***unreasonable*** or ***excessive*** force towards any person.

2. **405.2.1** It is the policy of the SEPTA Transit Police Department that the response to resistance, as described in this directive, shall be reported in a timely, complete, and accurate manner by involved officers. (Officer Cox did not document striking Ms. Howard in the face after they were separated)[2]

---

[2]     Parenthetical in original document. (ECF No. 32-15 at 12-13.)

3. **508.7.1** Conduct indicating that a member has little or no regard for his/her responsibilities as a member of the SEPTA Police Department

4. **508.7.1** Making an untruthful statement in the presence of any supervisor.

(ECF No. 32-15 at 12-13.) (emphasis in original).

Following its investigation, SEPTA Internal Affairs convened a Police Board of Inquiry ("PBI") to determine whether Plaintiff had in fact violated SEPTA Transit Police Department policies and procedures during the FTC incident. (*See generally* ECF No. 32-9.) The PBI upheld the Internal Affairs investigation, finding that there was sufficient evidence that Plaintiff violated SEPTA Transit Police policy. (ECF No. 32-21 at 3.) The PBI noted that the first instance in which Plaintiff engaged in a physical altercation with Howard before other officers arrived was not violative of policy, because "grappling and striking would have been authorized during that time frame to defend herself." (ECF No. 32-21 at 3.) The PBI found, however, that "[t]he totality of circumstances . . . show that Officer Cox . . . has little or no regard for her responsibilities as a member of the SEPTA Transit Police Department. This includes Officer Cox losing emotional control and applying the unnecessary use of force to the point where she had to be restrained by fellow officers and her subsequent Internal Affairs statements being inconsistent and not forthcoming." (ECF No. 32-21 at 3.) The Board recommended that Plaintiff be discharged from duty. (ECF No. 32-21 at 3.)

On December 4, 2019, Chief Nestel was sent the PBI recommendation that Plaintiff be discharged for violations of SEPTA directives 404.4.1 (Response to Resistance), 508.5.1 (Failure to Comply), , 508.7.1 (Conduct Indicating Little or No Regard), and 508.7.1 (Making an Untruthful Statement). (ECF No. 32-23 at 2.) Chief Nestel replied, instructing that SEPTA "[m]ove forward with the discipline." (*Id.*) Plaintiff and a FOTP representative signed a Discipline Issuance Notice

on December 6, 2019. (ECF No. 32-22.) Plaintiff's last day of service was December 6, 2019, and she was terminated on December 7, 2019. (ECF No. 32-5 at 2.)

### C. Referral to Philadelphia District Attorney's Office

SEPTA Transit Police Department Directive 100 states that, "pursuant to existing case law and the Philadelphia District Attorney's Office policy, the Transit Police are required to notify the DAO . . . . When an officer is the subject of an internal investigation which results in a founded finding or conclusion by the department for any of the following: . . . b. Lack of truthfulness or deception regarding facts in a report, statement, or testimony at a hearing or other official proceeding or investigation concerning on duty conduct of the officer or others." (ECF No. 32-16 at 10-11.) The directive further states that,

> Members placed on a [Police Misconduct Disclosure] list will be subject to an internal investigation which will determine whether placement on the list is justified and whether the member's ability to fulfill his/her duties as a police officer would be hampered by inclusion on a PMD. A determination that placement on the PMD is appropriate and that the member's ability to continue performing as a police officer has been negatively affected would constitute a dischargeable offense.

(ECF No. 32-16 at 10-11.)

The Police Misconduct Disclosure List was established by Philadelphia District Attorney Lawrence Krasner. (ECF No. 32-18 at 82:12-16.) According to Chief Nestel, DA Krasner established the Police Misconduct Disclosure List—a list of officers who lied and thus could no longer be found credible in court—so that those officers could not longer appear in court and testify. (ECF No. 32-18 at 83:14-21.)

At some point after the FTC incident and during the subsequent investigation, SEPTA referred Plaintiff to the Philadelphia District Attorney's Office ("DAO"). (ECF No. 32-1 at 17.) The exact date of the referral is not clear from the record. Following the referral, the District Attorney's Office made the determination that Plaintiff would be placed on the Police Misconduct

Disclosure List. (ECF No. 32-18 at 83:1-6.) As a result, she was not able to appear in court and testify. (*Id.* at 83:7-12.) Chief Nestel testified that as a result of being unable to testify in court, any arrest Plaintiff made "would be lost." (*Id.*)

### D. Termination and Appeal

Following her termination, Plaintiff filed a grievance through the FOTP, challenging SEPTA's decision to terminate her. (ECF No. 32-4 at 154:21-155:1.) SEPTA denied this grievance. (*See generally* ECF No. 32-24.) In its denial, SEPTA noted that Plaintiff punched Howard "without provocation" and "expressed pleasure in her actions." (ECF No. 32-24 at 2.) The denial also stated that SEPTA was "not persuaded by the Union's argument that Cox didn't lie during the internal affairs investigation." (*Id.*)

Plaintiff and FOTP then filed a grievance alleging that SEPTA violated the Collective Bargaining Agreement when it discharged Plaintiff for violating Directive 404 (Response to Resistance) and Directive 508 (Disciplinary Code). (ECF No. 32-26 at 3.) Following an arbitration proceeding, on August 14, 2020, the arbitrator denied the grievance. (ECF No. 32-26 at 19.)

On September 20, 2021, Plaintiff was issued a Right to Sue Notice by the EEOC. She commenced the present lawsuit on September 23, 2021.

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it could affect the outcome of the suit, given the applicable substantive law, and a dispute is genuine if the evidence presented is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating a summary judgment motion, a court "must

view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor. *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

The party opposing summary judgment must support each essential element of the opposition with concrete evidence in the record. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249-50 (internal citations omitted). This requirement upholds the "underlying purpose of summary judgment [which] is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense." *Walden v. Saint Gobain Corp*., 323 F. Supp. 2d 637, 641 (E.D. Pa. 2004) (citing *Goodman v. Mead Johnson & Co*., 534 F.2d 566, 573 (3d Cir. 1976)). Therefore, if after making all reasonable inferences in favor of the non-moving party, the court determines there is no genuine dispute as to any material fact, then summary judgment is appropriate. *Wisniewski v. JohnsManville Corp*., 812 F.2d 81, 83 (3d Cir. 1987).

## III.    DISCUSSION

### A.  Plaintiff's Opposition Brief

As an initial matter, the Court will briefly respond to the arguments Defendants make in their reply brief (ECF No. 44) regarding the insufficiency of Plaintiff's Opposition to the Motion for Summary Judgment (ECF No. 36). Defendants assert that "[a] large portion of Plaintiff's Statement of Disputed Material Facts in Opposition to Defendants' Motion for Summary Judgment (ECF No. 36-1) and Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment . . . consist of unsupported factual assertions and legal conclusions that are not based in any competent record evidence, and do not even contain citations to the record (or in some cases, the law)." (ECF No. 44 at 1-2.) Defendants contend that Plaintiff's brief contains many

factual assertions without citation to the record, and where there are citations, Plaintiff regularly mischaracterizes both the record and the law to her benefit. (*Id.* at 2-3.)

Generally, the Court agrees with Defendants' characterization of Plaintiff's opposition brief. The Court will not point out every deficiency, but as a general proposition, it is not the responsibility of the Court to dig through the record and find evidence to support a party's assertions. The Court has not considered portions of the brief where Plaintiff has neglected to cite to the record, for example, Plaintiff's "Introductory Statement." (ECF No. 36 at 1-6.) When relevant, the Court has also pointed out instances where Defendant has mischaracterized case law and has only relied on case law that actually stands for the proposition for which it is asserted.

In addition, Plaintiff's "Declaration," contains numerous factual and legal conclusions for which Plaintiff has no firsthand knowledge, as is required in a declaration. (ECF No. 36-7.) "An affidavit or declaration used to support or oppose a motion must be made on *personal knowledge*." Fed. R. Civ. P. 56(c)(4) (emphasis added). Applying this standard, the Court has only relied on ¶¶ 1-11 and 13 of Plaintiff's Declaration.

**B.  Claims under Title VII and the PHRA**

Title VII prohibits employers from failing to hire, discharging, or otherwise discriminating against "any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin" 42 U.S.C. § 2000e-2(a)(1). Because the analysis required for adjudicating Plaintiff's Title VII and PHRA claims is identical, the Court will consider those two claims together. *See Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 317, n. 3 (3d Cir.2000). In the absence of direct evidence of discrimination, the Supreme Court has set out a framework to analyze claims of racial discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

First, the plaintiff must prove by a preponderance of the evidence a *prima facie* case of discrimination. *Id.* at 802. If the plaintiff establishes a *prima facie* case of discrimination, a "presumption" of discrimination is created and the burden of production shifts to the defendant to articulate a legitimate nondiscriminatory reason for the adverse employment action. *Id.* at 802–03. In order for defendants to sustain this burden, they "need not persuade the court that [the adverse employment action] was actually motivated by the proffered reasons." *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). The defendant satisfies its burden of production, and rebuts the plaintiff's *prima facie* showing of discrimination, simply by introducing admissible evidence that, if taken as true, would permit a finding that the challenged employment action was taken for legitimate, nondiscriminatory reasons. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993). The inquiry concerning whether the defendant has met its burden of production "can involve no credibility assessment," since "the burden-of-production determination necessarily precedes the credibility-assessment stage." *Id.*

If the employer meets its burden of production, the presumption of discrimination created by plaintiff's *prima facie* case "drops out of the picture." *Id.* at 511 (citing *McDonnell Douglas*). In order to establish that the defendant is liable for illegal employment discrimination, the plaintiff must ultimately convince the trier of fact that a discriminatory animus was the real reason for the adverse employment action at issue. *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir.1994).

### 1.  Plaintiff's *Prima Facie* Case of Discrimination

To establish a *prima facie* case of employment discrimination, a plaintiff must demonstrate by a preponderance of the evidence that, "(1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for the position that he sought to retain; (3) the plaintiff suffered an adverse employment action, e.g., the termination of his employment; and (4) the adverse employment

action occurred under circumstances that could give rise to an inference of intentional discrimination." *Greene v. Virgin Islands Water & Power Auth.*, 557 F. App'x 189, 195 (3d Cir. 2014) (internal citations omitted).

For the purpose of their summary judgment motion only, Defendants do not dispute that Plaintiff is a member of a protected class and suffered an adverse employment action. (ECF No. 32-1 at 16.) However, Defendants state that Plaintiff has failed to establish prongs (2) and (4) of the *prima facie* test. They argue that she was unqualified for her position because her dishonesty during the Internal Affairs investigation rendered her unqualified for her role as a SEPTA officer. (*Id.*) Defendants also state that Plaintiff cannot establish any inference of discrimination, nor can she demonstrate that similarly situated Caucasian officers were treated more favorably than she. (*Id.*)

### a. Plaintiff's Qualification for Her Position as a SEPTA Officer

When assessing job qualification at the *prima facie* stage, Courts apply an objective standard, looking at only "the bare minimum requirement necessary to perform the job at issue. Typically, this minimum requirement will take the form of some type of licensing requirement, such as a medical, law, or pilot's license, or an analogous requirement measured by an external or independent body rather than the court or the jury." *Makky v. Chertoff*, 541 F.3d 205, 215 (3d Cir. 2008). In *Makky*, the Plaintiff, an engineer with the Transportation Security Administration, had his security clearance suspended, rendering him unable to access National Security Information, which was necessary to perform his job duties. *Id.* at 216. The Court found that the Plaintiff was no longer qualified for his role, noting, "the lack of a security clearance in a position such as Makky's is akin to the lack of a license in a position such as a medical doctor because without a security clearance Makky's subjective qualifications are irrelevant." *Id.*

Defendants argue that Plaintiff's being placed on the District Attorney's Office Police Misconduct List rendered her unable to perform a core function of her role, and thus, disqualified her from performing her job as a SEPTA officer. (ECF No. 32-1 at 17.) In his deposition, Chief Nestel testified that if an officer cannot testify in court, "any arrests that they would make would be . . . lost," and that testifying in court is a core job responsibility for SEPTA police officers. (ECF No. 32-18 at 82:16-24.) Like in *Makky*, Plaintiff's actions resulted in her being unable to perform a core function of her role. Plaintiff's inability to testify in court is akin to the lack of a necessary professional license.

Plaintiff does not address Defendants' argument that she was unqualified for the position beyond a single statement in her opposition brief that "she was hired as a police officer at SEPTA and therefore was qualified for the position." (ECF No. 36 at 11.) This statement alone, with no citation to evidence, does not refute Defendants' assertion that Plaintiff's actions during the FTC incident and the subsequent Internal Affairs investigation disqualified her from her job at SEPTA. The Court finds there is no genuine dispute as to the fact that Plaintiff was no longer qualified for her role when she was terminated.

This finding alone is sufficient to hold that Plaintiff has failed to establish a *prima facie* case of employment discrimination. However, given Plaintiff's focus on comparators, the Court will address the fourth element of the test as well.

### b. Whether the Circumstances Could Give Rise to an Inference of Intentional Discrimination

The fourth prong of the test for a *prima facie* case of race discrimination requires Plaintiff to show that "the adverse employment action occurred under circumstances that could give rise to an inference of intentional discrimination." *Greene*, 557 F. App'x at 195. "To establish the fourth element, a plaintiff may either: (1) introduce evidence of comparators (i.e., similarly situated

employees who (a) were not members of the same protected class and (b) were treated more favorably under similar circumstances); or (2) rely on circumstantial evidence that otherwise shows a causal nexus between [Plaintiff's] membership in a protected class and the adverse employment action." *Id.*

### i.    Comparator Evidence

Plaintiff relies primarily on purported comparators who, she alleges, are similarly situated employees who were not members of the same protected class and were treated more favorably under similar circumstances. In her complaint, Plaintiff identifies five Caucasian SEPTA employees who, she alleges, engaged in "similar or worse misconduct than what Defendants alleged Plaintiff engaged in." (ECF No. 1 ¶ 21.) These purported comparators are Officer Samuel Lynch, Officer Harry Dougherty[3], Officer Sinkiewicz[4], Officer Cory Fox, and Detective Bryan McCauley[5], each of whom, Plaintiff alleges, violated SEPTA policy and was not terminated for his actions. (*Id.* ¶¶ 22-26.)

Defendants argue that none of the SEPTA employees Plaintiff identifies are proper comparators under Third Circuit precedent. (ECF No. 32-1 at 22.) In order for employees to be considered similarly situated, courts "look to the job function, level of supervisory responsibility and salary, as well as other factors relevant to the particular workplace. This determination requires a court to undertake a fact-intensive inquiry on a case-by-case basis rather than in a mechanistic and inflexible manner." *Peake v. Pennsylvania State Police*, 644 F. App'x 148, 151 (3d Cir. 2016) (quoting *Monaco v. Am. Gen. Assur. Co.*, 359 F.3d 296, 305 (3d Cir. 2004)). Courts look to factors

---

[3]      Defendants address claims about Officer Dougherty in their brief, however, Plaintiff does not address Officer Dougherty at all in her Opposition brief, thus, the Court considers any claims about him to have been abandoned and will not address them.
[4]      In her complaint, Plaintiff refers to Officer "Sinckowitz." The Court will use what it understands to be the proper spelling of Officer Sinkiewicz's last name.
[5]      In her complaint, Plaintiff refers to McCauley as officer. However, the record shows that he was in fact a Detective, therefore, a different rank than Plaintiff. (ECF No. 32-18 at 13:7-9.)

such as whether "the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 223 (3d Cir. 2009) (internal citations omitted).

Defendants argue that "Plaintiff focused her discovery efforts on other police officers who engaged only in varying levels of force, which misses the mark because the evidence shows that SEPTA terminated Plaintiff's employment based on her conduct *during the investigation into her response to resistance*, including '[her] lack of candor.'" (ECF No. 32-1 at 22.) According to Defendants, "any officers who Plaintiff may attempt to put forth as comparators based on that officer's use of force will fail, as they cannot be considered proper comparators under Third Circuit case law if they engaged in conduct different than that for which Plaintiff was terminated." (*Id.* at 23).

Plaintiff devotes a considerable amount of her Opposition Brief to discussion about Officers Lynch and Sinkiewicz, who, by Plaintiff's own admission, were disciplined for incidents regarding uses of excessive force. (ECF No. 36 at 12-22; 25-26.) Plaintiff's brief restates her complaint's detailed description of these incidents involving use of force but does not address Defendant's arguments that these incidents are distinguishable from Plaintiff's situation. (*Id.*)

Plaintiff's brief also seems to make the argument, without evidence, that Officer Lynch made false statements and was not disciplined for them. (ECF No. 36 at 14.) Plaintiff states that "[Sergeant] Albertini admitted that Lynch gave a false statement in his R2R as compared to what was shown on the platform video." (*Id.*) However, the Court agrees with Defendants that Plaintiff mischaracterizes Sergeant Albertini's deposition testimony to make this claim. (ECF No. 44 at 2, citing ECF No. 36 at 14.) Albertini never states that Lynch made a false statement, and Plaintiff

does not point to any other evidence in the record indicating that SEPTA found that Officer Lynch made false statements.

The Court agrees with Defendants that officers who were disciplined only for engaging in varying levels of force, including Officers Lynch and Sinkiewicz, are not proper comparators to Plaintiff. The record is clear that Plaintiff was found to have violated SEPTA's policy regarding response to resistance but was ultimately terminated for her untruthful statements during the internal affairs investigation. The law in this Circuit is also clear that employees are not similarly situated when their conduct is not similar. *See Oakley v. Orthopaedic Assocs. of Allentown, Ltd.*, 742 F. Supp. 2d 601, 608 (E.D. Pa. 2010) ("[E]mployees are similarly situated when their conduct on the job-or misconduct-is similar in nature."); *see also McCullers v. Napolitano,* 427 F. App'x 190, 195 (3d Cir. 2011). There is no genuine dispute of fact that these officers, who were disciplined for meaningfully different conduct, are not proper comparators.

Defendants also argue that Officer Fox and Detective McCauley are not proper comparators. (ECF No. 32-1 at 23.) Officer Fox was charged for "making a false entry on a SEPTA report or record." (ECF No. 34-1.) Officer Fox was not disciplined for lying during the subsequent Internal Affairs investigation into his conduct; Officer Fox admitted to SEPTA Internal Affairs that he made a false report. (ECF No. 36-9 at 27:6-10.) In addition, Officer Fox was disciplined in 2014, before the policy was instituted of referring officers who lied to the Philadelphia District Attorney's Office to potentially be placed on the Police Misconduct Disclosure List. (ECF No. 32-18 at 82:5-11.) Defendants argue that the fact that Officer Fox's misconduct is distinguishable from Plaintiff because Officer Fox was disciplined for a single lie, and that lie was itself the underlying incident, while Plaintiff engaged in separate misconduct during her altercation with Ms. Howard, then subsequently lied multiple times during the Internal Affairs investigation. (ECF

No. 32-1 at 24.) Defendants also contend that because the Police Misconduct Disclosure List policy was not in place when Officer Fox was disciplined, he was not at risk of losing his ability to be subpoenaed and therefore becoming unqualified for his role. (*Id.*)

Defendants also argue that Detective McCauley is not a proper comparator, because he was a detective, while Plaintiff was an officer, and employees of different positions are not proper comparators. (ECF No. 32-1 at 25; ECF No. 32-18 at 13:7-9.) Defendants also distinguish between Plaintiff and Detective McCauley because Detective McCauley reported directly to former Chief Nestel, while Plaintiff did not. (ECF No. 32-18 at 13:4-6.) In addition, termination was in fact recommended as punishment for Detective McCauley's misconduct. (ECF No. 32-1 at 25.) Plaintiff's distinction between her own termination and Detective McCauley's appears to rely on the fact that Detective McCauley resigned, while she was terminated. (ECF No. 36 at 27.) Defendants argue that Detective McCauley asked to resign, while Plaintiff did not request that option. (ECF No. 32-1 at 25.)

The Court agrees with Defendants that neither Officer Fox nor Detective McCauley are proper comparators. Plaintiff's untruthful statement was the underlying event that led to her being disciplined. Plaintiff engaged in separate misconduct—her use of force—and then twice lied to investigators about the incident. (ECF No. 32-1 at 23-24). These incidents involving the Plaintiff are not comparable to the circumstances that led to the purported comparators' discipline. In addition, as the Court has already determined, being placed on the DA's Police Misconduct Disclosure List renders an officer unqualified to perform their job. The policy of referring officers to the DA was not yet instituted when Officer Fox was disciplined, therefore, he was not put on the list. (ECF No. 32-18 at 82:5-11.) That change in policy constitutes a "differentiating . . . circumstance" that distinguishes SEPTA's treatment of Plaintiff versus Officer Fox. *Ballard v.*

*Mercy Catholic Med. Ctr.*, No. 12-0779, 2013 U.S. Dist. LEXIS 92108, at *15 (E.D. Pa. June 28, 2013).

With respect to Detective McCauley's termination, the fact that he was of a different rank and had a different supervisor than Plaintiff is dispositive in establishing that he is not a proper comparator to Plaintiff. *See Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 882 (3d Cir. 2011) ("[A]lthough the postmaster was disciplined for the same misconduct as [Plaintiff], she is nonetheless not comparable because she held a superior position and thus it was at the discretion of a different supervisor not to terminate her."). Again, there is no genuine dispute of material fact that the officers Plaintiff offers as comparators are not similar situated to her.

### ii.    Circumstantial Evidence

In addition to introducing purported comparators, Plaintiff offers circumstantial evidence of discriminatory conduct by Defendants. Plaintiff seems to rely on a single piece of circumstantial evidence—"the outrageous racially discriminatory conduct of Officer McCauley and how favorably he was treated by Defendants," including that "he was not terminated but allowed to resign in lieu of termination, and then sent a letter of regret by Chief Nestel for no longer working for him at SEPTA." (ECF No. 36 at 37.) Plaintiff asserts that "[t]his conduct of condoning racist behavior in the Police Department by Defendants, in of itself, is circumstantial evidence of Defendants' motives, state of mind and culture in which the adverse actions taken against Plaintiff was made. A reasonable jury can consider all the totality of the circumstances in this case and decide that Plaintiff was subjected to race discriminatory adverse actions by Defendants." (*Id.*)

As Defendants point out in their reply brief, in making this claim, Plaintiff relies almost exclusively on caselaw that is inapplicable to this case. (*See* ECF No. 44 at 7-9.) In order to meet the proper standard for showing evidence that could give rise to an inference of discrimination,

Plaintiff must "establish a causal nexus between the termination of his employment and his membership in a protected class." *Greene*, 557 F. App'x at 196. Plaintiff has failed to do that here.

First, Plaintiff has not shown that Detective McCauley's conduct, regardless of how offensive it was, is evidence of discriminatory motive on the part of SEPTA or Chief Nestel. Defendants correctly note that "McCauley was not a company executive and was not speaking on employment practices or managerial policy when he engaged in the conduct that ultimately resulted in his termination." (ECF No. 44 at 9.) Nor was Detective McCauley "involved in the investigation into Plaintiff's conduct or her subsequent termination." (*Id.*)

Plaintiff has also failed to offer any evidence of a discriminatory motive on the part of SEPTA or Chief Nestel. Plaintiff relies on the fact that Detective McCauley resigned rather than being terminated, and that Chief Nestel sent Detective McCauley a "letter of regret" following his leaving SEPTA. (ECF No. 36 at 37.) Although Plaintiff seems to be making the argument that the record shows that Detective McCauley was offered special treatment in being able to resign, the record evidence that Plaintiff points to—Chief Nestel's deposition testimony—states that "[the opportunity to resign] is offered to every employee who is being notified that they're being terminated." (ECF No. 36-3 at 70, 30:17-24.) In addition, Plaintiff has not substantiated her claim Chief Nestel "condoned" Detective McCauley's actions. (ECF No. 36 at 37.) It was Chief Nestel who informed Detective McCauley that he was being terminated. (ECF No. 36-3 at 20-23.) The letter Chief Nestel sent Detective McCauley does not contain any statements that suggest that Chief Nestel thought McCauley's actions were acceptable, or that he should not have been terminated. (ECF No. 36-5.)

Moreover, Defendants argue that by admitting "in her deposition to initially denying knowing whether she struck Ms. Howard in the first two interviews and then admitting that she

did strike her in the third interview with Internal Affairs, Plaintiff essentially conceded that she was not candid during the first two interviews with Internal Affairs." (ECF No. 32-1 at 18.) According to Defendants, Plaintiff's admission as to the conduct for which she was terminated undermines her claim that her race was part of SEPTA's determination to terminate her employment. (*Id.*)

The circumstantial evidence Plaintiff offers does not show any causal nexus between her termination and her race. The Court agrees with Defendants that the fact that Plaintiff admitted to making untruthful statements during her Internal Affairs interviews undermines her argument that it was her race, rather than her dishonesty, that led to her being fired.

In addition to the Court's finding that Plaintiff was unqualified for the role at the time of her termination, Plaintiff also failed to present any circumstantial evidence of racial discrimination or show that similarly situated individuals outside of her protected class were treated more favorably. Thus, the Court finds no genuine issue of material fact that Plaintiff has failed to establish a *prima facie* case. Because Plaintiff has not established a *prima facie* case of discrimination, Defendant is entitled to summary judgment on Plaintiff's Title VII and PHRA claims.

### 2. PHRA Aiding and Abetting Claim Against Former Chief Nestel

Plaintiff also alleges in her complaint that "Chief Nestel aided and abetted in SEPTA's racial discriminatory actions against Plaintiff." (ECF No. 1 ¶ 41.) "[T]he PHRA makes it unlawful for 'any person . . . to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice.'" *Bernhard v. Brown & Brown of Lehigh Valley, Inc.*, 720 F. Supp. 2d 694, 705 (E.D. Pa. 2010) (citing 43 Pa. Con. Stat. § 955(e)). However, "individual defendants cannot be held liable for violations of Section 955(e) if there is no primary

violation of the PHRA." *Sampson v. Methacton Sch. Dist*., 88 F. Supp. 3d 422, 446 (E.D. Pa. 2015). Because the Court has concluded that summary judgment shall be granted for Defendants on the PHRA claim, it must follow that Plaintiff's aiding and abetting claim against Chief Nestel fails as well, and summary judgment is granted in favor of Chief Nestel.

### C. Section 1983 Equal Protection Claim

Plaintiff asserts a § 1983 claim for violations of her Fourteenth Amendment rights and of § 1981 of the Civil Rights Act. (ECF No. 1 ¶¶ 43-54.) Plaintiff brings these claims against SEPTA and against Chief Nestel in his official capacity (*Id.*) In order to state a claim under § 1983, "a plaintiff must allege the violation of a right secured by the Constitution and/or laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *Berkery v. Wissahickon Sch. Bd*., 99 F. Supp. 3d 563, 569 (E.D. Pa.), *aff'd sub nom. Berkery v. Wissahickon Sch. Dist. Bd. of Directors*, 628 F. App'x 109 (3d Cir. 2015). "Section 1983 does not provide substantive rights, but instead, 'provides a remedy for the deprivations of rights established elsewhere in the Constitution or federal laws' . . . . Thus, to establish a § 1983 violation, Plaintiff must allege facts sufficient to establish that Defendants, acting under color of state law, deprived Plaintiff of a right secured by the Constitution or by the laws of the United States." *Id.* (internal citations omitted).

### 1. § 1983 Equal Protection Claims and § 1981 Claims against SEPTA and Chief Nestel

In order to bring a § 1983 Equal Protection claim, a plaintiff must prove "the existence of purposeful discrimination" *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990) (citing *Batson v. Kentucky*, 476 U.S. 79, 93 (1986)). Plaintiff must show "that the defendant, acting under color of state law, treated the plaintiff differently from other individuals similarly situated, and 'the different treatment was improperly motivated by discrimination.'" *Alers v. City of*

*Philadelphia*, 919 F. Supp. 2d 528, 556 (E.D. Pa. 2013) (quoting *Zappan v. Pa. Bd. of Prob. & Parole*, 152 Fed.Appx. 211, 219 (3d Cir.2005).

In the absence of direct evidence of discrimination, § 1983 discrimination claims are analyzed under the *McDonnell Douglas* burden shifting framework. *Alers*, 919 F. Supp. at 556. Employment discrimination claims under § 1981 are identical to Title VII employment discrimination claims. *Id.* (citing *Mieczkowski v. York City Sch. Dist.*, 414 Fed.Appx. 441, 445 n. 2 (3d Cir.2011)). While § 1981 provides Plaintiff her rights, § 1983 is the vehicle for Plaintiff to seek damages to remedy alleged violations of §1981. *McGovern v. City of Philadelphia*, 554 F.3d 114, 116 (3d Cir. 2009).

In support of her § 1983 and § 1981 discrimination claims, Plaintiff relies on the same set of facts she used to support her Title VII and PHRA claims. (*See generally* ECF No. 1.) As the Court explained in detail above, Plaintiff has failed to establish a *prima facie* case of racial discrimination under Title VII and the PHRA. *See supra*, Section III.B.(1)(a-b). The Court found that Plaintiff failed to show that she was treated differently from other similarly situated individuals, or provide other circumstantial evidence that could give rise to an inference of intentional discrimination. Based on this same reasoning, the Court finds that Plaintiff has failed to prove a genuine issue of material fact as to her § 1983 discrimination claims and her § 1981 claims. Summary judgment is granted in favor of Defendants as to Counts III and IV.

Although this is the end of the inquiry, the Court will speak briefly on the issue of *Monell* liability.

### 2.   SEPTA's Policy or Custom of Racial Discrimination

It is undisputed that SEPTA is treated as a municipality for purposes of § 1983 claims. *Brown v. SEPTA*, 539 F. App'x 25, 27 (3d Cir. 2013). The Supreme Court held in *Monell* that to

hold a municipality liable under § 1983, a plaintiff must show a policy or custom that caused her injury. *Monell v. New York City Dept. of Social Servs*., 436 U.S. 658, 694 (1978). In order to prove liability for an equal protection violation against a municipality under § 1983, a Plaintiff must: 1) identify a policy or custom that deprived her of a federally protected right; 2) "demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged"; and 3) show "a direct causal link between the municipal action and the deprivation of federal rights." *Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997) (emphasis in original).

Nowhere in her complaint does Plaintiff identify a SEPTA policy or custom of racial discrimination. Despite Defendants addressing this lack of a supposed policy or custom in their Motion for Summary Judgment, in her Opposition Brief Plaintiff again fails to identify such a policy or custom. (ECF No. 32-1 at 32.)

"To establish a *Monell* claim against a municipality, "[a] plaintiff must *identify the challenged policy*, attribute it to the [municipality] itself, and show a causal link between execution of the policy and the injury suffered." *Kocher v. Larksville Borough*, 926 F. Supp. 2d 579, 602 (M.D. Pa.), *aff'd*, 548 F. App'x 813 (3d Cir. 2013) (citing *Losch v. Borough of Parkesburg*, 736 F.2d 903, 910 (3d Cir.1984)) (emphasis added). Because Plaintiff has failed to identify the policy or custom of discrimination she alleges exists, Defendants argue that she has abandoned her § 1983 claims. (ECF No. 44 at 6-7.) Whether Plaintiff abandoned her claims or simply failed to establish them, the outcome is the same. Plaintiff has not identified any policy or custom of racial discrimination by SEPTA or by Chief Nestel.

**D.  Whether Former Chief Nestel is Entitled to Qualified Immunity**

Because the Court has granted summary judgment for Defendants on Plaintiff's equal protection claims, it need not reach the question of whether Chief Nestel is entitled to Qualified Immunity.

**IV.    CONCLUSION**

For the foregoing reasons, the Court will grant Defendants' Motion for Summary Judgment in its entirety. An appropriate Order will follow.

**BY THE COURT:**

**/s/ Hon. Kelley B. Hodge**

**HODGE, KELLEY B., J.**